# EXHIBIT A

Filing # 208373934 E-Filed 10/07/2024 12:25:16 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: _____________

MARTIN BORKAN an individual, and
MSB HOSPITALITY, LLC, a
Florida Limited Liability Company,

Plaintiffs,

v.

SOMETHING GOOD SUPPER CLUB, LLC, a
Delaware Limited Liability Company,
SOMETHING SHORT, LLC, a
Delaware Limited Liability Company,
SANDO SUPPPLIES, LLC, a
New York Limited Liability Company,
ILAN KHUTORSKY, an individual,
RAPHAEL KHUTORSKY, an individual

Defendants.
____________________________________ /

**COMPLAINT**

Plaintiffs MARTIN BORKAN ("Borkan") and MSB HOSPITALITY, LLC ("MSB") (collectively, "Plaintiffs") hereby sue Defendants SOMETHING GOOD SUPPER CLUB, LLC ("Something Good"), SOMETHING SHORT, LLC ("Something Short"), ILAN KHUTORSKY ("Ilan"), SANDO SUPPPLIES, LLC ("Sando Supplies"), and RAPHAEL KHUTORSKY ("Raph"), (collectively, Something Good, Something Short, Sando Supplies, Ilan, and Raph are the "Defendants") and state as follows:

**PARTIES JURISDICTION AND VENUE**

1. Plaintiff MARTIN BORKAN is an individual *sui juris* and a resident of Miami-Dade County, Florida.

2. Plaintiff MSB HOSPITALITY LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. MSB Hospitality's managing member is *Martin Borkan Declaration of Trust* UIA DTD 12/03/2021.

3. Defendant SOMETHING GOOD SUPPER CLUB, LLC is a Delaware limited liability company with its principal place of business in New York, New York. Something Good's managers are Ilan Khutorsky and Raphael Khutorsky, both are citizens and residents of New York.

4. Defendant SOMETHING SHORT, LLC is a Delaware limited liability company with its principal place of business in New York, New York. Upon information and belief, Something Short's managers are Ilan Khutorsky, Raphael Khutorsky, and Jeckson Leonardo – all of whom are citizens and residents of New York.

5. Defendant SANDO SUPPPLIES, LLC is a New York limited liability company with its principal place of business in New York, New York. Sando Supplies' managers and members include Ilan Khutorsky and Raphael Khutorsky, both are citizens and residents of New York.

6. Defendant ILAN KHUTORSKY is an individual *sui juris* and a resident of New York, New York. Ilan Khutorsky is a member and manager of Something Good and Sando Supplies.

7. Defendant RAPHAEL KHUTORSKY is an individual *sui juris* and a resident of New York, New York. Raphael Khutorsky is a member and manager of Something Good and Sando Supplies.

8. This Court has subject matter jurisdiction over this declaratory relief action and over claims arising from the *Mediated Settlement Agreement* ("Settlement Agreement") attached hereto as **Exhibit A**.

9. This Court has personal long arm jurisdiction over Defendants pursuant to Florida Statute 48.193(1)(a)(2) because, as described in greater detail below, Defendants committed tortious acts against MSB within this District and/or committed tortious acts outside of this District causing injury in this District to Plaintiffs – thereby submitted themselves to the jurisdiction of the courts of this State.

10. This Court has personal long arm jurisdiction over the Defendants pursuant to Florida Statute 48.193(7) because Defendants breached a contract in this State by failing to perform acts required by the contract to be performed in this State.

11. Personal jurisdiction over Defendants meets the minimum contacts or due process requirements such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice because modern methods of transportation and communication (e.g., Zoom and other video conferencing platforms) reduce significantly any burden on Defendants to litigate in the State of Florida; and because The State of Florida has a strong interest in seeing this matter resolved in Florida, as the dispute involves services performed by out-of-state companies to a Florida company.

12. Venue is proper in Miami-Dade County because the Settlement Agreement provides that an action to enforce its terms may be brought in the state courts of Florida, because most of the Defendants have waived any challenge to jurisdiction or *forum non conveniens*, and because the causes of action accrued herein.

13. Any conditions precedent to bringing this action have been performed, have occurred, have been waived, or have otherwise been excused.

## FACTS COMMON TO ALL COUNTS

**The 'Something Good' Family of Companies**

14. MSB had a previous business relationship with Defendant Something Good, which holds itself out as a restaurant and events/catering business in New York, New York.

15. Something Good, in turn, is the parent of several limited liability companies in the 'Something Good' family of companies.

16. Something Good's subsidiaries/affiliates are Defendant Something Short, Something Good Restaurants LLC ("Something Restaurants"), and Something Good Events, LLC ("Something Events") (altogether, Something Short, Something Restaurants, and Something Events are the "Affiliates" and, together with Something Good, the "Company").

17. Borkan was named individually as a "responsible party" and submitted his Social Security Number to the Internal Revenue Service for purposes of obtaining an Employee Identification Number (EIN) for each of the Affiliates.

**The Prior Lawsuit and Settlement Agreement**

18. After MSB made a passive, non-managerial investment in Something Good, certain disputes arose between the parties.

19. On May 21, 2023, MSB initiated a prior lawsuit[1] ("Prior Lawsuit") by filing a *Verified Complaint* against the Defendants.

20. Therein, MSB alleged various business torts related to MSB's participation in Something Good.

---

[1] *See MSB Hospitality, LLC v. Something Good Supper Club et al.,* No. 23-cv-21888-JIM (S.D. Fla.). Plaintiffs acknowledge that the merits of the Prior Lawsuit are not at issue in this action; rather, the Prior Lawsuit is referenced as material background of the parties' business relationship which culminated in the Settlement Agreement at issue in this action.

21. On July 25, 2023, Plaintiffs and Defendants engaged in a robust, in-person mediation, which culminated in the Settlement Agreement.

22. The intent of the Settlement Agreement was a 'clean break,' whereby MSB would be bought out from the Company, ne'er to have to deal with the Defendants ever again.

23. Among the Settlement Agreement's key provisions which demonstrate this intent:

a. **Section 2**: Defendants agreed to buy out MSB's membership interest (if any) in Something Good and its Affiliates;[2]

b. **Section 3**: MSB and Borkan immediately relinquished any ownership interest (if any) they had in Something Good and/or the Affiliates;

c. **Section 7**: Each of the Defendants obligated itself to obtain MSB's and/or Borkan's releases from any obligation related to Something Good and/or the Affiliates, including without limitation the pending New York State Liquor Authority (SLA) Application by Something Short;

d. **Sections 8 and 9**: Saving any obligations arising from or related to enforcement of the Settlement Agreement, the parties exchanged general releases;

e. **Section 11**: The parties agreed not to disparage the other, whereby if any non-party asked about the Prior Lawsuit, the parties were obligated "to simply say that 'it was resolved amicably' and/or that 'Martin Borkan through his entity was bought out.'";

f. **Section 13**: Each of the Defendants obligated itself to further assurances (including signing any "documents reasonable and necessary in order to carry out the purpose and intent of this [Settlement] Agreement"); and

g. **Section 13**: Each of the Defendants obligated itself to "act in good faith and use its best efforts to expeditiously comply with all of the terms and conditions [in the Settlement Agreement]."

24. In addition to the foregoing, the following provisions of the Settlement Agreement are pertinent to this action:

---

[2] Defendants buyout obligation pursuant to Section 2 of the Settlement Agreement remains ongoing and in full force and effect. Through this action, neither MSB nor Borkan waives entitlement to receive all monies owed to them pursuant to Section 2 of the Settlement Agreement.

h. **Section 18**: Provides that the Settlement Agreement "shall be construed and governed exclusively by the laws of the [State of] Florida . . . [and] is enforceable in the state or federal courts of Florida."; and

i. **Section 19**: Provides for prevailing party attorneys' fees.

**Defendants Dilatory Post-Settlement Conduct Begins – Borkan is Not Immediately Removed From the Company's Governing Documents**

25. Borkan and MSB fully performed under the Settlement Agreement.

26. MSB and Borkan, by the terms of the Settlement Agreement, relinquished any ownership interest they had in the Company.

27. However, as explained in further detail below, Ilan, Raph, Sando Supplies, and Something Good Supper Club did not.

28. MSB and Borkan reasonably expected that, after signing the Settlement Agreement, they would be completely removed from any further affiliation with the Company.

29. By way of example: MSB reasonably expected that the Defendants would (jointly and severally) cause the Company to immediately amend its various governing documents to reflect MSB's removal, and that the Company would inform all governing bodies (e.g., the IRS, the New York municipal and State taxing authorities) and vendors/suppliers that MSB was no longer a member of the Company.

30. Defendants failed to do so "expediciously" as required under the Settlement Agreement.

31. On December 19, 2023, undersigned spoke with one of the Company's attorneys, Hari Kalyan, who represented that Something Short had already amended its operating agreement to reflect Borkan's removal.

32. Undersigned memorialized that understanding and requested evidence of same by e-mail the same date, however Mr. Kalyan never responded.

33. Undersigned followed up in January 2024, however Mr. Kalyan once again never responded.

34. Through January 2024, MSB continued to receive notices (written and oral) from vendors, suppliers, and/or taxing authorities referencing Borkan as the "owner" or "responsible party" and requesting payment on various invoices or liabilities associated therewith.

35. Upon information and belief, the Company's failure to remove Borkan from the Company's governing documents was motivated primarily by financial gain, to wit: if Borkan is still 'on paper' as the owner of various Company affiliates, then the Company can exculpate itself and create a cognizable defense to non-payment, to wit: that they are not financially responsible, Borkan is.

**Borkan Was Not Immediately Removed From Something Short's New York State Liquor Authority Application**

36. Furthermore, and upon information and belief, the Company's failure to remove Borkan and MSB from the Company was part of its sophisticated scheme to leverage MSB and Borkan's industry experience with the SLA in hopes of obtaining a full liquor license (which they never did).

37. For approximately one (1) year prior to the Settlement Agreement, Something Short had a pending application with the New York State Liquor Authority ("SLA") for a commercial liquor license (the "SLA Application").

38. The SLA Application was made at a time when MSB was ostensibly a minority member of the Company.

39. Borkan was at all times material hereto individually named as Something Short's 'principal of record' for purposes of the SLA Application. The reason Borkan was named as the

principal of record was because, as between he (Borkan) and the Company's other members, Borkan was the 'only' individual with liquor experience, or any dealings with the SLA.

40. So long as Borkan was associated with the SLA Application, Borkan was exposed to liability in the event that Something Short committed violations of New York State liquor laws.

41. During the time when the Prior Lawsuit was pending, Borkan became concerned with the manner with which the Company was operating, to the extent that it was in violation of New York State liquor laws and could expose Borkan to significant liability.

42. On June 23, 2023, i.e., during the pendency of the Prior Lawsuit and before the Settlement Agreement, MSB (through legal counsel) sent correspondence to the SLA (the "First SLA Letter").

43. Through the First SLA Letter, MSB *inter alia* provided cautionary notice to the SLA of what MSB understood to be Something Short's forthcoming violations of New York State liquor laws, and disavowed any involvement in Something Short for purposes of the SLA Application.

44. On June 27, 2023, also during the pendency of the Prior Lawsuit and before the Settlement Agreement, MSB (through legal counsel) sent a follow-up letter to the SLA (the "Second SLA Letter").

45. Through the Second SLA Letter, MSB *inter alia* provided documentary evidence to the SLA of what MSB understood to be Something Short's clear violations of New York State liquor laws.

46. As the foregoing demonstrates, Something Short's SLA Application was of significant importance to Borkan and was material to the release which Borkan expected in the Settlement Agreement.

47. The Settlement Agreement contemplates that the Company would take immediate and affirmative action to remove Borkan from the SLA Application.

48. MSB reasonably expected that the Company would take such affirmative action.

49. However: the Company has failed to take timely corrective action and failed to use its best efforts to remove Borkan from the SLA application.

50. Upon information and belief, sometime after the Settlement Agreement, Something Short obtained a ***temporary liquor license*** pursuant to the pending SLA Application with Borkan's principal affiliation.

51. For months after the Settlement Agreement, MSB (through counsel) requested documentation from the Company which demonstrated that MSB had been removed from the SLA Application.

52. The Company failed to respond.

53. On December 1, 2023, the SLA sent Something Short written correspondence in connection with the SLA Application, styled a *Deficiency Letter*.

54. As of the time of the Deficiency Letter, the SLA still had not confirmed Borkan's removal and was still requesting documentation from the Company evidencing same.

55. On December 4, 2023 (i.e., over 5 months after the Settlement Agreement), Ilan e-mailed MSB's legal counsel and confirmed to counsel that Borkan had not yet been removed from the SLA Application.

56. On December 6, 2023, Ilan e-mailed MSB's legal counsel again to confirm that Borkan had not been removed from the SLA Application.

57. Over the course of several back-and-forth e-mails, MSB (through counsel) informally requested the Company provide (i) a copy of the SLA Application, (ii) any amendments

thereto, (iii) any communication which the Company has had with the SLA which mention Borkan or MSB; and (iv) any forms required by the SLA which require MSB's signature to effectuate removal from the SLA Application.

58. The Company failed to meaningfully respond to undersigned requests for documentation.

59. On December 11, 2023, undersigned sent written correspondence to the Company related to the SLA Application.

60. Through the December 11, 2023 correspondence, MSB and Borkan formally requested those documents it had informally requested a few days prior.

61. Upon information and belief, Borkan was not removed from the SLA Application until at least sometime after February 2024.

62. Upon information and belief, the Company's failure to remove Borkan from the SLA Application is motivated primarily by financial gain, to wit: if the applicant's principal (Borkan) is no longer associated with the applicant (Something Short), then the Company risks losing its temporary liquor license and revenue associated therewith.

**Borkan Is Still Affiliated With the Company's "Toast" and Other Company Vendors/Supplier Accounts**

63. One of the key technologies in the restaurant business is a "Point of Sale" or POS system; and, one of the most popular POS systems in the restaurant industry is *Toast*.

64. The Company uses the Toast POS system.

65. When it signed up for Toast (i.e., before the Prior Lawsuit and Settlement Agreement), Borkan signed as the principal of record and guarantor of the account. The reason Borkan was the principal of record was because he (Borkan) had the creditworthiness to support the application.

66. Accordingly, the Settlement Agreement's release provisions apply and Defendants were obligated to remove Borkan from the account.

67. Toast is one of several vendors towards which MSB and Borkan reasonably expected Defendants would take affirmative action to remove Borkan as a guarantor.

68. Defendants (jointly and severally) failed to do so in an expedicious manner.

69. After MSB (through counsel) inquired the status of Borkan's removal from Toast, Defendants (through counsel) affirmatively represented on November 29, 2023 that "[Borkan] has already been removed from the Toast account."

70. This was false.

71. In November 2023, Borkan was still receiving order notifications from the Toast system.

72. In December 2023, Toast informed Borkan that a balance was due on the account, and that he was the owner on file responsible for payment (not the Company).

73. As of January 10, 2024, Borkan was still receiving invoices from Toast requesting payment from him of Something Short financial obligations.

74. As of January 30, 2024, Borkan was still receiving notices from Toast advising him that he was listed as the owner on file for Short Stories.

75. Upon information and belief, the Company's failure to timely remove Borkan from the Toast Account is motivated primarily by financial gain, to wit: if the Toast account principal (Borkan) is no longer associated with the account, then the Company risks losing the sales data and functionality of the Toast system, together with any preferential rates of use that came with Borkan's creditworthiness and past history in the restaurant business; and, if there are monies due

on the Toast account, then the Company's non-payment could be exculpated by shifting that obligation to the primary account holder (Borkan).

**Borkan Is Still, to This Day, Receiving Notices of Delinquency From and Having to Negotiate With the New York State Taxing Authorities.**

76. When Plaintiffs assigned their interest in the Company back to Ilan and Raph, they reasonably expected that the Company (together with the other parties to the Settlement Agreement) would jointly and severally, "expediciously," and with "best efforts" take all necessary measures to protect MSB and/or Borkan from liability from any and all taxing authorities, including New York State.

77. They failed to do so.

78. After the Settlement Agreement was reached, the Company failed to immediately file the requisite forms with the New York State taxing authorities to remove Borkan as a "responsible person" – thereby exposing Borkan to tax liability and civil penalties.

79. For months following the Settlement Agreement, Borkan received notices from the New York State tax authorities imposing tax liability on him, individually.

80. Through the date of this filing, Plaintiffs are still in active discussions with the New York State taxing authorities to absolve Borkan and MSB from tax liability incurred by the Company.

**Defendants Engaged in a Conspiracy to Defraud Investors In Order to Make the Buy Out Payments to MSB and Borkan.**

81. Section 2 of the Settlement Agreement obligates Defendants to pay Plaintiffs $450,000.00, payable over time. (the "Buy Out Payments").

82. However, because of the Prior Lawsuit, it was a material condition of the Settlement Agreement that the Buy Out Payments derive from a "lawsful source."

83. Upon information and belief, beginning as early as July 2023 (in and around the time the Settlement Agreement was executed), Defendants were looking for a 'mark' to unlawfully fund the Buy Out Payments due to Plaintiffs under the Settlement Agreement.

84. One such person was George Blesson ("Blesson").

85. Ilan, a New York licensed attorney, leveraged his professional licensure to the benefit of the Company when he approached Blesson to invest in the Company.

86. Ilan also held himself out as both "President" and "Manager" of the Company, including both Something Good and Something Short.

87. In July 2023, Ilan (on Company letterhead) signed a *Side Letter Agreement* with George and another investor, whereby George would invest $38,000.00 in the Company, on express condition that if the Company did not receive a full liquor license by October 1, 2023, that the Company would immediately return Blesson's investment back to him within 15 calendar days thereof.

88. The Side Letter made clear that, failure to obtain a liquor license by October 1, 2023 would made the Company's purpose "impossible."

89. Also in July 2023, Ilan (himself and on behalf of the Company) and George signed an *Amendment to Side Letter Agreement*, which purportedly served "to confirm certain matters mutually agreed upon by the parties hereto." The Side Letter Amendment provides as follows:

**[Continued on following page]**

1. Restrictions on Use of Investors' Capital Contributions .

Neither the Company nor any of its Affiliates, Managers, Members or any other Persons associated with the Company shall utilize any of the Capital Contributions provided by the Investors (each, as listed on Exhibit A of the Something Short Operating Agreement) until the Company (i) receives a liquor license from the relevant governing authority of New York State that is not a temporary liquor license and (ii) is operating a full food and beverage service, including, but not limited to the sale of alcohol in compliance with a liquor license granted by New York State that is not a temporary liquor license, in accordance with the purpose described in the Something Short Operating Agreement at least five (5) days per week. Notwithstanding the foregoing, the Company may deposit the Capital Contributions provided by the Investors in the Company's bank account; provided, that such Capital Contributions are not utilized in any manner and shall remain in the Company's bank account until the conditions set forth in this Letter Agreement Amendment have been fulfilled.

---

90. As the Side Letter Amendment confirms, ***none*** of the investments made into the Company could be utilized until the Company received a ***full liquor license***.

91. Blesson was unaware of the Prior Lawsuit at the time he invested in the Company.

92. As of the date of this action, the Company (including Something Short) has not received a full liquor license from the SLA.

93. In total, between July 2023 and February 2024, the Company solicited approximately **Five Hundred Thousand Dollars ($500,000.00)** in investments ("Solicited Investments").

94. Not coincidentally, the Solicited Investments amount to a little over the amount of the Buy Out Payments due to Plaintiffs under the Settlement Agreement.

95. Upon information and belief, each of the investors in the Company was solicited on false pretenses.

96. The true purpose of their investment was to pay the Buy out Payments to Plaintiffs under the Settlement Agreement and not to operate the Copmany.

97. Upon information and belief, some or all of the Defendants have misappropriated and taken the Solicited Investments for their own benefit, to the detriment of their investors.

98. Upon information and belief, the Company is operating at a significant deficit (over $300,000.00 in the year since the Solicited Investments).

99. Plaintiffs have engaged the services of the undersigned law firm and have agreed to pay a reasonable fee.

100. Plaintiffs are entitled to recover their reasonable attorneys' fees and costs against Defendants, jointly and severally.

**COUNT I: DECLARATORY RELIEF**
**(Unlawful Payments)**

101. Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 100 as if fully set forth herein.

102. This is an action for declaratory relief to declare the rights of the parties with respect to the Buy Out Payments made to date.

103. MSB and Borkan, as the recipients of $200,000.00 in Buy Out Payments to date, are uncertain about the legality of the source of such funds.

104. Plaintiffs contend, but some or all of the Defendants deny, that the $200,000.00 Buy out Payments made to Plaintiffs to date came from an unlawful source (to wit, the result of the conspiratory securities fraud perpetrated on the Company's investors in and around the time of the Settlement Agreement onward).

105. Plaintiffs been adversely affected because the status of such Buy out Payments has been called into question, thereby exposing Plaintiffs to potential claims of disgorgement due to the Defendants' illegal conduct.

106. There is a bona fide, actual, present, and practical need for a declaration of the

lawful or unlawful status of the $200,000.00 Buy Out Payments made to Plaintiffs.

107. The declaration sought herein is not to obtain legal advice.

108. Plaintiffs have retained undersigned counsel and agreed to pay a reasonable fee for legal services.

109. Pursuant to the Settlement Agreement, applicable Florida law, Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs incurred in bringing this action.

**WHEREFORE,** Plaintiffs respectfully request judgment in their favor and against Defendants, declaring that the $200,000.00 of Buy Out Payments made to Borkan to date were from an unlawful source, directing Ilan, Raph, Sando Supplies, and Something Good to replace such payments using lawful funds, and making such further declarations concerning the rights and responsibilities of the parties as necessary to resolve their ongoing disputes, award pre-judgment interest, costs, attorneys' fees, and for such other equitable relief the Court deems just and proper.

**COUNT II: BREACH OF SETTLEMENT AGREEMENT**

110. Plaintiffs adopt and reallege each and every allegation contained in Paragraphs 1 through 100 above as if specifically set forth herein.

111. This is an action for breach of the Settlement Agreement.

112. The Settlement Agreement is a valid contract.

113. The Settlement Agreement requires each of Ilan, Raph, Sando Supplies, and Something Good to, *inter alia,* make the Buy Out Payments using only a "lawful source" of funds (generally, the "***Buy Out Obligation***.").

114. The Settlement Agreement requires each of Ilan, Raph, Sando Supplies, and Something Good to, *inter alia,* specifically obtain MSB's and/or Borkan's releases from any obligation related to Something Good and/or the Affiliates, including without limitation the

pending New York State Liquor Authority (SLA) Application by Something Short (generally, the "***Release Obligation***").

115. The Settlement Agreement requires each of Ilan, Raph, Sando Supplies, and Something Good to, *inter alia,* provide further assurances and sign any "documents reasonable and necessary in order to carry out the purpose and intent of this [Settlement] Agreement." (generally, the "***Further Assurances Obligation***").

116. The Settlement Agreement requires each of the Defendants to "act in good faith and use its best efforts to expeditiously comply with all of the terms and conditions [in the Settlement Agreement]." (the "***Good Faith/Best Efforts Obligation***").

117. Defendants breached the Settlement Agreement.

118. Defendants breaches are more particularly described above, and include (without limitation):

a. Making the Buy Out Payments to date using an unlawful source of funds;

b. Failing to expeditiously and in good faith update the Company's operating agreements to remove MSB;

c. Failing to expeditiously and in good faith inform appropriate governmental and taxing authorities that MSB/Borkan are no longer affiliated with the Company;

d. Failing to expeditiously and in good faith remove Borkan and his personal information (i.e., his Social Security Number) as the responsible party for EIN purposes for each of the Company's Affiliates;

e. Failing to use best efforts and/or expeditiously remove Borkan from the SLA Application;

f. Failing to remove MSB/Borkan from all Company vendor accounts (e.g., Toast); and

119. As a result of Defendants' breaches, MSB and Borkan have been harmed.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against each of the Defendants, and entering an order compelling Defendants to specifically perform under the Settlement Agreement in a manner consistent with the relief sought herein, awarding Plaintiffs their attorneys' fees and costs, and for all such further relief that this Court deems equitable and just.

**COUNT III: SPECIFIC PERFORMANCE (SETTLEMENT AGREEMENT)**
*(Pled in the Alternative to Breach of Settlement Agreement)*

120. Plaintiffs adopt and reallege each and every allegation contained in Paragraphs 1 through 100 above as if specifically set forth herein.

121. This is an action by MSB against each of the Defendants who are parties to the Settlement Agreement for specific performance under the Settlement Agreement.

122. Plaintiffs and Defendants are parties to the Settlement Agreement.

123. The Settlement Agreement is a valid contract.

124. Plaintiffs have performed under the Settlement Agreement.

125. The Settlement Agreement requires each of the Defendants, *inter alia,* to specifically obtain MSB's and/or Borkan's releases from any obligation related to Something Good and/or the Affiliates, including without limitation the pending New York State Liquor Authority (SLA) Application by Something Short (generally, the "***Release Obligation***").

126. The Settlement Agreement requires each of the Defendants to provide further assurances and sign any "documents reasonable and necessary in order to carry out the purpose and intent of this [Settlement] Agreement." (generally, the "***Further Assurances Obligation***").

127. The Settlement Agreement requires each of the Defendants to "act in good faith and use its best efforts to expeditiously comply with all of the terms and conditions [in the Settlement Agreement]." (the "***Good Faith/Best Efforts Obligation***").

128. Through their conduct described herein, Defendants have failed/or refused to perform the Release Obligation, Further Assurances Obligation, or Good Faith/Best Efforts Obligation.

129. Defendants' performance is unique, and no adequate remedy at law exists to compel the Defendants to fully perform the foregoing obligations under the Settlement Agreement.

130. Specific performance is necessary.

131. Plaintiffs are entitled to their attorneys' fees and costs in bringing this action.

**WHEREFORE**, Plainiffs respectfully request that the Court enter judgment in their favor and against each of the Defendants, awarding MSB damages, and for all such further relief that this Court deems equitable and just.

**JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

**PARDO LAW PLLC**
*Counsel for Plaintiffs*
1205 Lincoln Road, Suite 211
Miami Beach, Florida 33139
Telephone: (305) 308-7388
Email: joe@pardolawmiami.com

By: */s/ Joseph I. Pardo, Esq.*
Joseph I. Pardo, Esquire
Florida Bar No. 1003339

**Exhibit A**

# MEDIATED SETTLEMENT AGREEMENT

**THIS MEDIATED SETTLEMENT AGREEMENT** ("Agreement") is made and entered into as of the Effective Date set forth below by and between Plaintiff MSB Hospitality, LLC ("MSB" or "Plaintiff"), Martin Borkan ("Borkan"), and Defendants Something Good Supper Club, LLC ("Something Good"), Raphael Khutorsky ("Raphael"), Ilan Khutorsky ("Ilan"), and Sando Supplies, LLC ("Sando") (Defendants are collectively referred to at times as "Defendants") (Plaintiff, Borkan, and Defendants are each a "Party", and collectively referred to at times as the "Parties").

**WHEREAS,** the Parties are involved in a certain dispute by and amongst each other (the "Dispute");

**WHEREAS,** a lawsuit arose out of the Dispute in that certain case styled *MSB Hospitality, LLC v. Something Good Supper Club, LLC., et al.*, bearing case number 23-cv-21888-JEH, and pending in the United States District Court, Southern District of Florida (the "Action");

**WHEREAS,** the Parties have respectively denied any wrongdoing, and to avoid the expense of litigation wish to resolve the Dispute and Action on the terms and conditions set forth herein;

**WHEREAS,** on July 25, 2023, the Parties attended an in-person mediation in New York before Judge Carpinello (Ret.) and agreed to resolve the Dispute, Action, and all disagreements between them, consistent with the terms herein; and

**NOW THEREFORE**, in consideration of the foregoing and the mutual promises, undertakings and agreements contained herein, the Parties hereby agree as follows:

1. **Recitals.** The foregoing recitals are true and correct and incorporated herein by this reference.

2. **Payment.** Defendants agree to pay Plaintiff the amount of $450,000, to buy it out of MSB's membership interest in Something Good, including any and all ownership interest that MSB or Borkan may have in any affiliated entities of Something Good, including but not limited to Something Short LLC and Something Good Events LLC (the "Buyout"). Defendants shall be allowed to use any lawful source for payment of the Buyout, including funds that are provided by third parties, through loans, or otherwise. The Buyout shall be paid by Defendants in the following manner:

   a. $100,000 paid within 60-days of the Effective Date; plus
   b. $100,000 paid within 90-days of the Effective Date; plus
   c. $250,000 paid within 15-months of the Effective Date.

(collectively, the "Buy Out Payments").

3. **Ownership**. MSB and Borkan hereby give up and forever relinquish any ownership

IK RK MSB

interest that they may have or claim in Something Good and any of Something Good's affiliated entities, including but not limited to Something Short LLC and Something Good Events LLC. MSB and Borkan also agree to enter into any documents provided to them by Something Good to effectuate that relinquishment of ownership.

5. **Retraction Letter**. Within three days of the Effective Date, Plaintiff and Borkan shall send a joint letter to Pardalis & Nohavicka LLP and Steven Kim (collectively, "P&N") retracting that certain May 1, 2023 letter Plaintiff and Borkan sent to P&N (the "Letter"), advising P&N that Plaintiff and Borkan withdraws the accusations made in their Letter, and advising that any and all disputes between Plaintiff, Borkan, Ilan, Raphael, Something Good, and Sando have now been resolved.

6. **Charge Backs**. Within three days of the Effective Date, MSB and Borkan shall contact each financial institution they made a charge back with to reverse any charge backs made at those institutions with respect to Something Good or any of Something Good's vendors, including but not limited to, Fuerst Ittleman David & Joseph. The Parties will work in good faith to identify those vendors that charge backs were made and to take corrective action.

7. **Personal Guarantees**. Defendants shall obtain MSB and/or Borkan's release from any personal guarantees that they may have signed with respect to Something Good, including with respect to Capital One Sparks credit card, as well as with respect to the New York State Liquor Authority. To the extent Defendants are unable to obtain MSB and/or Borkan's release from any personal guarantees that they may have signed with respect to Something Good, Defendants shall indemnify, defend, and hold MSB and/or Borkan harmless from and against all demands, liabilities, obligations, actions, claims, damages, penalties, causes of action, judgments, interest, penalties, losses, costs and expenses resulting from or arising out of MSB and/or Borkan's personal guarantees that they actually signed with respect to Something Good.

8. **Plaintiff and Borkan's Release**. Plaintiff and Borkan, on behalf of themselves and on behalf of their directors, members, owners, investors, managers, officers, shareholders, employees, subcontractors, attorneys, successors and assigns, and insurers (collectively "Borkan Releasors"), for good and valuable consideration, do hereby remise, release, acquit and forever discharge Defendants, Leonid Khutorksy, Nelly Khutosky, Something Short LLC and Something Good Events LLC, and their directors, officers, shareholders, members, owners, employees, subcontractors, attorneys, successors and assigns, and insurers (collectively "Releasees"), of and from all causes of action, suits, debts, sums of money, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which each of the Borkan Releasors ever had, now has, or which it hereafter can, shall or may have against the Releasees for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the Effective Date, including, without limitation, any claims asserted or that could have been asserted in the Dispute or Action (collectively "Released Claims"). Notwithstanding the foregoing, Plaintiff may bring an action to enforce this Agreement, including the entry of the consent judgment should there be a breach, and/or for damages for breach of this Agreement as provided herein.



IK RK MSB

a. **Plaintiff's Covenant Not to Sue**. Borkan Releasors covenant not to sue and/or initiate any legal action against the Releasees for any of the Released Claims.

9. **Defendants' Release**. Defendants, on behalf of themselves and on behalf of their directors, members, owners, investors, subsidiaries, managers, officers, shareholders, employees, subcontractors, attorneys, successors and assigns, and insurers, and on behalf of Leonid Khutorksy and Nelly Khutosky (collectively "Khutorksy Releasors"), for good and valuable consideration, do hereby remise, release, acquit and forever discharge Plaintiff and Borkan, and their directors, officers, shareholders, members, owners, employees, subcontractors, attorneys, successors and assigns, and insurers (collectively "Releasees"), of and from all causes of action, suits, debts, sums of money, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which each of the Khutorsky Releasors ever had, now has, or which it hereafter can, shall or may have against the Releasees for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the Effective Date, including, without limitation, any claims asserted or that could have been asserted in the Dispute or Action (collectively "Released Claims"). Notwithstanding the foregoing, Defendants may bring an action to enforce this Agreement and/or for damages for breach of this Agreement as provided herein.

a. **Defendants' Covenant Not to Sue**. Khutorsky Releasors covenant not to sue and/or initiate any legal action against the Releasees for any of the Released Claims.

10. **Notices.** Any notice, direction, request, instruction, legal process or other instrument to be given or served hereunder shall be in writing and shall be delivered by email, and shall be deemed received upon delivery, to all Parties at the following addresses:

(a) If to Plaintiff:

MSB
Attn: Martin Borkan
Email address: msborkan@gmail.com

With a copy to:

Pardo Jackson Gainsburg, PL
Attn: Joseph Pardo, Esq.
E-Mail: joe@pardojackson.com

(b) If to Something Good:

Something Good
Attn: Ilan Khutorksy
Email: ikhutorsky@gmail.com

With a copy to:



IK RK MSB

Goetz Fitzpatrick LLP
Attn: Howard Rubin, Esq.
Email: hrubin@goetzfitz.com

(c) If to Ilan:

Email: ikhutorsky@gmail.com

With a copy to:

David M. Levine, Esq.
Sanchez Fischer Levine, LLP
Email: dlevine@sfl-law.com

(d) If to Raphael:

Email: chefraph@somethinggoodhsp.com

With a copy to:

David M. Levine, Esq.
Sanchez Fischer Levine, LLP
Email: dlevine@sfl-law.com

(e) If to Sando:

Attn: Raphael Khutorsky
Email: chefraph@somethinggoodhsp.com

With a copy to:

David M. Levine, Esq.
Sanchez Fischer Levine, LLP
Email: dlevine@sfl-law.com

11. **Non-Disparagement**. The Parties, and all of their employees, contractors, or agents, agree to not make any statements, oral or written, which are intended, directly or indirectly, to disparage and/or defame the other Party, and if any non-party asks about this Dispute or Action, the Parties are to simply say that "it was resolved amicably" and /or that "Martin Borkan through his entity was bought out."

12. **Confidentiality**. The Parties hereby agree that the terms, provisions and conditions of this Agreement shall forever be kept confidential by each Party and shall not, in any manner or



IK RK MSB

for any reason, be disclosed by any Party, except (a) as may be required by government agencies, such as the Internal Revenue Service; (b) pursuant to court order compelling such disclosure; or (c) in the event a Party is forced to file a motion seeking to enforce any term or condition of this Agreement. Should any Party or his representative receive any such agency directive or court order compelling disclosure, the Party shall immediately notify the other Party in writing by email, so that the other Party may have the opportunity to interpose an objection. Should any Party receive any inquiries regarding or relating to the Dispute or Action, it shall simply say that "it was resolved amicably" and /or that "Martin Borkan through his entity was bought out."

13. **Further Assurances**. Each of the Parties hereto shall execute such further documents reasonable and necessary in order to carry out the purpose and intent of this Agreement. Each Party shall act in good faith and use its best efforts to expeditiously comply with all of the terms and conditions herein.

14. **Successors and Assigns.** This Agreement shall be binding upon the Parties hereto and upon their heirs, administrators, representatives, executors, divisions, parents, subsidiaries, parents' subsidiaries, affiliates, partners, limited partners, successors and assigns, and shall inure to the benefit of said Parties and each of them and to their heirs, administrators, representatives, executors, divisions, parents, subsidiaries, parents' subsidiaries, affiliates, partners, limited partners, successors and assigns.

15. **Authority.** Anyone who signs this Agreement or the exhibits hereto in a representative capacity represents and warrants that he or she is fully authorized to execute and enter into this Agreement on behalf of and to legally bind the Party for whom he or she signs.

16. **Selective Enforcement**. The Parties agree that the failure of any Party to enforce or exercise any right, condition, term or provision of this Agreement shall not be construed as or deemed to be a waiver or relinquishment thereof, and the same shall continue in full force and effect.

17. **Non Admission of Liability**. Except with respect to any breach of this Agreement, the Agreement does not represent an admission of liability. The Parties understand the uncertainties of litigation, and have mutually agreed to forgo that risk by entering into this Agreement.

18. **Governing Law and Interpretation; Jury Waiver**. This Agreement shall be construed and governed exclusively by the laws of the Florida, without giving effect to its conflict of laws provisions. The Parties further agree this Agreement is enforceable in the state or federal courts of Florida. In the event that any Party breaches any provision of this Agreement, the Parties affirm that they may institute an action to specifically enforce any term or terms of this Agreement for damages as provided herein or both. The Parties waive any right to trial by jury, which either may have in any action to interpret, apply or enforce this Agreement, or in which this Agreement is asserted as a defense.



IK RK MSB

19. **Attorney's Fees**. It is agreed and understood that the Parties shall bear their own costs and attorneys' fees with respect to the Dispute and Action, including all costs and attorneys' fees incurred in connection with, or in any way related to, the negotiation or consummation of this Agreement. In the event of any dispute, controversy or claim arising in connection with this Agreement, including any dispute to enforce the terms of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs, including reasonable attorneys' fees and costs incurred in litigating entitlement to reasonable attorneys' fees and costs, as well as in determining the amount of recoverable reasonable attorneys' fees and costs, whether incurred before suit, during suit, at the appellate level and/or in connection with any related bankruptcy proceeding. The reasonable costs to which the prevailing Party is entitled shall include costs that are taxable under any applicable statute, rule or guideline, as well as non-taxable costs, including but not limited to, costs of investigation, copying costs, electronic discovery costs, telephone charges, mailing and delivery charges, information technology support charges, consultant and expert witness fees, travel expenses, court reporter fees, and mediator fees, regardless of whether such costs are otherwise taxable.

20. **Dismissal**. Within three days of the Effective Date, Plaintiff shall file a notice of dismissal of the Action with prejudice with each Party bearing their own costs and attorney's fees, and with the Court retaining jurisdiction to enforce the terms of this Agreement.

21. **Consent Judgment**. If Defendants fail to timely pay the Buyout Payments, MSB shall provide a Notice of Default to Defendants and Defendants shall have 15-days ("Time to Cure") from the date of transmission of the Notice of Default to cure. Failing a cure of the default by Defendants within the Time to Cure, MSB shall be entitled to an entry of a Consent Final Judgment against Ilan and Raphael, jointly and severally, for $825,000 less any monies received. The Consent Final Judgment shall be in the form and manner and jurisdiction (either Florida state or federal court with a waiver of forum non conveniens) attached hereto as **Exhibit A** and shall be entered upon an affidavit of non-payment and motion for consent judgment. MSB shall not argue that it is a fraudulent conveyance or a breach of this Agreement for Defendants to liquidate their assets upon a default to help satisfy the consent judgment. MSB reserves all rights should any Party declare bankruptcy.

22. **Return of Property**. Within 7-days of the Effective Date, MSB and Borkan shall return to Defendants all property, files, and other Defendants materials in their possession (including any computers, laptops, cell phones, PDAs, credit cards, keys, badges, parking pass, jump drive/USB, etc.), and all copies of computerized databases and related materials, including any and all materials currently in their possession, custody or control. Additionally, within 7-days of the Effective Date, MSB and Borkan will provide Defendants with all passwords and logins required or necessary to access Defendants files, documents or information, and to transfer and/or remove themselves from same (including but not limited to Quickbooks, Paychex, Toast, Google Workspace). Within 7-days of the Effective Date, Defendants will endeavor to advise MSB and Borkan of all property, logins, passwords, and other information they need MSB and Borkan to return and MSB and Borkan, in turn, will forever disclaim such access.

23. **2022 Tax Returns**. Something Good and its subsidiaries will file 2022 state and federal tax returns, including all appendix thereto, and prior to filing will provide the draft tax



IK RK MSB

returns to MSB to review by its accountants at MSB's expense and the Parties will work in good faith to resolve any disputes over the tax returns.

24. **Amendments or Modifications**. Any amendment or modification of this Agreement must be in writing and signed by all of the Parties hereto.

25. **Headings; References**. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the interpretation of this Agreement.

26. **Survival of Warranties**. The representations and warranties contained in this Agreement shall survive the execution and delivery of this Agreement.

27. **Counterparts; Copy of Agreement Valid**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same agreement. The Parties agree that executed copies of this Agreement shall be valid and binding, in the event the original executed counterparts to the Agreement are missing. In the event that any signature is delivered by facsimile transmission or by the signature page being sent via e-mail to the other Party as a portable data format (pdf.) file or image file attachment, such signature shall create a valid and binding obligation of the Party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

28. **Electronic Signatures/Counterparts**. This Agreement and the other Settlement Documents may be signed via electronic signature, which shall constitute the original for all purposes, and simultaneously in counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument.

29. **Entire Agreement.** This Agreement contains the entire understanding of the Parties with respect to the subject matter thereof. Any other prior agreements, promises, negotiations or representations, either oral or written, relating to the subject matter of this Agreement are hereby superseded, terminated and of no force or effect. The Parties further acknowledge that they have not executed this Agreement in reliance on any promise, oral or written representation, or warranty from or by any other Party, except as expressly set forth herein.

30. **Severability.** If any provision of this Agreement is held invalid, unenforceable or unconstitutional, it shall be amended by the Parties or by a court of competent jurisdiction rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. The invalidity or unenforceability of any provision of this Agreement shall not affect the other provisions contained herein, all other provisions or terms of this Agreement shall remain valid and of full force and effect, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

**IN WITNESS WHEREOF**, the Parties hereto knowingly and voluntarily execute this Final Settlement Agreement as of the date last signed below ("Effective Date").



IV RR MSB

| | |
|---|---|
| **Good Supper Club, LLC**<br><br>____________________<br>By: Ilan Khutorsky<br>Its: Member<br>Date: July 25, 2023 | **Raphael Khutorsky**<br><br>____________________<br>Date: July 25, 2023 |
| **Sando Supplies, LLC**<br><br>____________________<br>By: Raphael Khutorsky<br>Its: Member<br>Date: July 25, 2023 | **Ilan Khutorsky**<br><br>____________________<br>Date: July 25, 2023 |
| **MSB Hospitality, LLC**<br><br>____________________<br>By: Martin Borkan<br>Its: Authorized Representative<br>Date: July 25, 2023 | **Martin Borkan**<br><br>____________________<br>Date: July 25, 2023 |



IK RK MSB

**Exhibit A**

MSB Hospitality, LLC, a
Florida Limited Liability Company,

Plaintiff,

v.

SOMETHING GOOD SUPPER CLUB, LLC, a
Delaware Limited Liability Company,
SANDO SUPPLIES, LLC, a
New York Limited Liability Company,
ILAN KHUTORSKY, an individual, and
RAPHAEL KHUTORSKY, an individual,

Defendants.
_______________________________________/

**CONSENT FINAL JUDGMENT AGAINST DEFENDANTS**

**THIS CAUSE** came before the Court on Plaintiff MSB Hospitality, Inc.'s ("Plaintiff") Motion to Enforce Plaintiff and Defendants Ilan Khutorsky ("Ilan") and Raphael Khutorsky ("Raphael") (collectively, the "Khutorskys") Mediated Settlement Agreement (the "Agreement") dated July 25, 2023 (the "Motion"). Having reviewed the Motion, the Agreement, Plaintiff's affidavit of the Khutorskys non-compliance with the Agreement, and being otherwise duly advised on the premises, it is hereby **ORDERED AND ADJUDGED** that:

1. The Plaintiff's Motion is **GRANTED**.

2. **FINAL JUDGMENT IS ENTERED** in favor of Plaintiff MSB Hospitality, Inc. and against Defendants Ilan and Raphael, in the amount of $825,000 [[less any payments made to MSB by Defendants under the Agreement]], which sum shall bear interest at the statutory rate per annum from the date of this final judgment until it is fully satisfied, for all of which let execution issue forthwith.



IK RK MSB

**DONE and ORDERED** in Chambers in the _________Florida this ____ day of ________, 201__.

_______________________________________
JUDGE



JK RK MSB